IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SCOTT KILLINGSWORTH, § § Plaintiff, § § v. § § SID PETERSON MEMORIAL HOSPITAL § DBA PETERSON REGIONAL MEDICAL § CENTER, § § Defendant. § | Civil Action No. 20-1393 |

## PLAINTIFF SCOTT KILLINGSWORTH'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Scott Killingsworth was employed by Defendant Sid Peterson Memorial Hospital dba Peterson Regional Medical Center. This is an action for disability discrimination and retaliation under the Americans with Disabilities Act (ADA) as amended by the ADA Amendments Act (ADAAA), and the Texas Commission on Human Rights Act (TCHRA).

**Parties**

1. Plaintiff Scott Killingsworth is an individual residing at 1703 Atlas Rd., Cedar Park, Texas 78613. He may be served with papers in this case through the undersigned counsel.

2. Defendant Peterson Regional Medical Center is a corporation organized under the laws of the State of Texas. It maintains its principal place of business at 551 Hill Country Drive, Kerrville, Texas 78028. It may be served with process through its registered agent, Cory L. Edmonson, at 551 Hill Country Drive, Kerrville, Texas 78028.

## Jurisdiction and Venue

3. The Court possessed subject matter jurisdiction over this case because Plaintiff's claims are brought under a federal statute, the Americans with Disabilities Act and the ADA Amendments Act. The Court possesses personal jurisdiction over Defendant because Defendant constantly conducts business in Texas and maintains offices in Texas. Venue is proper in the Western District of Texas because all of the events giving rise to Plaintiff's claims occurred within the geographic confines of the San Antonio Division.

## Factual Background

4. Plaintiff is a combat veteran of the U.S. Army. He joined the Army as a combat medic in 2006 and was deployed to Iraq (2007-2009 Operation Iraqi Freedom).

5. He has suffered the effects of PTSD since 2009. The Veterans' Administration considers Plaintiff 100% disabled due to burns he has suffered, hearing problems, migraines, PTSD, and sleep apnea.

6. On January 4, 2016, Plaintiff commenced employment with Peterson Regional Medical Center in Kerrville as a surgical tech. While employed by Peterson, Plaintiff worked under director Diana Johns (up until her termination in December 2018), and then under director Susan Roig.

7. In spring 2017, Plaintiff experienced post-traumatic stress while assisting on a leg amputation surgery. He successfully finished the surgery, but excused himself immediately thereafter. This was the first time (since being at Peterson) that Plaintiff had been involved in a leg amputation. This particular surgery brought back painful memories for Plaintiff from the time he served as a combat medic in Iraq. Plaintiff had done many surgeries since he had been employed

with Peterson and had never had an issue with them. It was strictly the leg amputation surgeries that Plaintiff realized he was not comfortable doing.

8. The following day, Plaintiff went to speak with Diana Johns (director at the time) and Arnold Smith (scheduler/supervisor). Plaintiff told Ms. Johns, "I'm not one to deny work, but if I could not be on these leg amputations, that would be good." Plaintiff then explained why; he told Ms. Johns and Mr. Smith that he brought back bad memories that he did not know existed until he was in the midst of the leg amputation surgery. Based on comments and jokes from co-workers, it became clear to Plaintiff that Mr. Smith had revealed to others around the office that Plaintiff suffered from PTSD. Additionally, Plaintiff would leave for appointments at the Kerrville VA approximately once per week. The Company did not require Plaintiff to take FMLA for this and they did not request doctor's notes.

9. The next day, a coworker—Sam Harrah (also a surgical tech)—walked by Plaintiff and said, 'Oh what, a big bad soldier can't handle a little leg?" Ms. Harrah was well known at the hospital for creating a hostile environment. She often did not follow rules and did not get punished for doing so. When Ms. Harrah made this hurtful comment, Plaintiff did not respond. However, Plaintiff did report the comment to Arnold Smith, who was the second in command. Nothing happened to Ms. Harrah as a result of Plaintiff's report.

10. Ms. Harrah continued to make anti-military comments in Plaintiff's presence, which was a regular occurrence. She would talk about how much she disliked the military and guns to coworkers in Plaintiff's presence.

11. In March 2018, around St. Patrick's Day, there was an employee party at an employee's house attended by both Plaintiff and Ms. Harrah. That night, Ms. Harrah was taking a picture and noticed that Plaintiff was in the background. She said in a hostile manner, "Get the

3

f*ck out of the way, Scott." She then pushed Plaintiff. There were many witnesses to the incident. Plaintiff was flabbergasted by Ms. Harrah's behavior, but he did not response or make a scene.

12. In approximately December 2018, Susan Roig took over as director.

13. At one point, Ms. Roig wanted the techs to learn a particular procedure at the surgical day center. When it was Plaintiff's turn to go learn and do the procedure with the trainer, Geno LNU, Plaintiff believed he did a good job.

14. Later that same day, Geno advised Plaintiff to return to the surgical center. Plaintiff was informed that Ms. Roig did not feel that he had done a good enough job the first time. When Plaintiff returned to the surgical center, he took a notebook with him so he could take notes. After Geno explained and performed the procedure. When it came time for the second procedure, Geno instructed Plaintiff to take the lead. Plaintiff declined because he did not feel comfortable yet with the procedure. Geno unexpectedly stood directly in front of Plaintiff in a hostile manner. No one else was around. Geno yelled, "Why do you have to be so difficult, Scott?" Plaintiff was blindsided by this reaction, as he had done nothing to provoke Geno. Plaintiff responded, "I'm trying to learn what you want me to learn." Plaintiff's tone was not confrontational. However, Geno responded, "Do you want to take this outside, Scott?" Geno was in a defensive posture as if he wanted to fight Plaintiff. Plaintiff did not react to the situation. Instead, Plaintiff excused myself and immediately went to HR. However, as it turns out, Plaintiff would find out later that when Plaintiff made a beeline for HR, Geno went directly to Ms. Roig.

15. After the incident, Plaintiff spoke with Buddy Voight (HR). Plaintiff told him that Geno threatened Plaintiff and explained how it unfolded. Mr. Voight said, "Okay, we will get Susan down here." Then Ms. Roig came down to Mr. Voight's office (apparently after she had already spoken with Geno). Ms. Roig said to Plaintiff, "Well I heard you threatened Geno."

Plaintiff told her that it was not true. She then said, "But a doctor overheard you." Plaintiff was dumbfounded by this. They never revealed the identity of the physician who supposedly overheard. Plaintiff told Ms. Roig, "But no one was around." Mr. Voight then chimed in, "Okay, Scott. We know you have PTSD and you're suffering from symptoms." Plaintiff was stunned that his medical condition was being brought up. Ms. Roig said, "I've seen a change in you and I know you're doing some therapy." Plaintiff was confused by this. Yes, Plaintiff had left work early to attend therapy appointments at the VA, but he had not announced this. In fact, Plaintiff was not required to do so. Plaintiff asked Ms. Roig and Mr. Voight how this situation was being turned around on him when he was the one who reported feeling threatened. Plaintiff did not get an answer. The meeting concluded, and Plaintiff returned to work.

16. Later that same day, Plaintiff again met with Mr. Voight and Ms. Roig. Ms. Roig advised, "You can take time off." Plaintiff was blindsided and asked, "How long do you need me to take?" Ms. Roig responded, "As long as you need." She never confirmed how much time away from work she wanted Plaintiff to take. Ms. Roig then elaborated, "We've decided to let you have some time off of work to focus just on therapy and getting better. If you don't, you can't be here anymore." This was clearly an ultimatum--either Plaintiff take time off of work, get fired. Plaintiff felt he was being reprimanded not only because he reported the incident with Geno, but also because of his PTSD. Plaintiff asked Ms. Roig, "And what will happen with Geno?" Ms. Roig then told Plaintiff not to worry about what was going to happen to Geno. At one point, Mr. Voight said that many people live and survive with PTSD. Before the meeting concluded, Plaintiff told both Ms. Roig and Mr. Voight that they had no right to talk about PTSD and how people can survive with it. Plaintiff was offended by their remarks.

17.     On one occasion, Plaintiff's coworker, John Fernandez, said, "Arnold has been joking about your PTSD." It is Plaintiff's understanding that Mr. Fernandez had actually reported Mr. Smith's jokes to Defendant.

18.     Shortly thereafter, Plaintiff went to the VA and told his doctor that the Company advised him to take time off. Plaintiff's doctor told Plaintiff he should be off for 90 days. Plaintiff's insurance told him this would be covered and would not an issue. Ms. Roig also said this "sounded good." Plaintiff asked her if he was going to be fired once he returned to work after the 90 days, and he was reassured that he would not be. In fact, Ms. Roig said, "No, we love you here." Plaintiff took Ms. Roig at her word and felt assured that his job was secure.

19.     During his time off, Plaintiff attended therapy appointments. He was put on STD, and then FMLA through his insurance. Plaintiff never got paid while on leave.

20.     Through the short term disability administrator, Plaintiff was approved to return to work on July 8, 2019. Plaintiff immediately contacted Defendant and advised management that he would return on July 8. Plaintiff spoke with Ms. Roig and Mr. Smith about this. Plaintiff wanted to return to work as soon as possible since he had not been paid while on leave.

21.     Plaintiff reported to work on Monday, July 8 and was happy to do so. When Plaintiff, Mr. Smith told him that he needed a work release form before he could officially return to work. Mr. Smith advised Plaintiff that, per Ms. Roig, Plaintiff needed to "clock out now." Plaintiff was also told he could not return to work without a release. Despite this, Mr. Smith also asked Plaintiff to work his required on-call shift. This confused Plaintiff, as it seemed to contradict the mandate that he not work without a release.

22.     Plaintiff made an appointment to be seen at the VA so he could get the required work release form. Once Defendant received the work release form, Plaintiff returned to work. Plaintiff later discovered that Defendant had the work release the entire time.

23.     On or about July 31, Mr. Smith had called Plaintiff into the office during his lunch. When Plaintiff walked into the office, he saw that Ms. Roig was also present. Ms. Roig said, "Well I have to write you up because we found out you didn't return to work when you were supposed to." Plaintiff did not understand what she was referring to and immediately referenced the paperwork that he had shown both Ms. Roig and Mr. Smith that said Plaintiff was to return on July 8. Ms. Roig responded, "Well the doctor's note we have says July 1." Plaintiff told Ms. Roig that he was never informed that his return date was July 1. Ms. Roig said she needed to write Plaintiff up as it was the directive coming from HR. Ms. Roig also advised Plaintiff that he was being written up for numerous "tardies," most of which occurred prior to the time that Ms. Roig was Plaintiff's supervisor. In fact, Plaintiff had permission from his prior supervisor and from Mr. Smith to arrive late for work due to nighttime college commitments and other reasons.

24.     Ms. Roig then said, "And I have a second thing. I was told by three people that you refused to do a surgery last week." Plaintiff then asked, "What surgery?" Ms. Roig said it was a broken ankle surgery. Plaintiff was shocked by this allegation, as he actually preferred to do these types of surgeries. Plaintiff would never would refused participating in such a surgery. Plaintiff told Ms. Roig that the allegation was untrue. Ms. Roig responded, "That's what they said, Scott." Plaintiff told her that he was not scheduled on the surgery in question and that he was doing another surgery during that same time. Mr. Smith then told Plaintiff that this accusation was coming from Ms. Harrah, who had displayed great animosity against Plaintiff due to his PTSD. Plaintiff later learned that Ms. Harrah had told others around the office that she was going to try to get me fired.

25. Mr. Smith was the scheduler/supervisor, so he could have easily referenced the schedule and seen that during this supposed ankle surgery, Plaintiff was in the midst of another surgery scheduled for the same time. In the event that Plaintiff did refuse a surgery, Plaintiff would have had to go through Mr. Smith. Mr. Smith should have known that this did not happen.

26. Ms. Harrah, on several occasions, had refused to do surgeries with doctors based on their political beliefs. Based on information and information and belief, Ms. Harrah was never reprimanded for these refusals.

27. Sometime after, Plaintiff was in the middle of a surgery (double mastectomy). Ms. Harrah was also supposed to be present, but she was nowhere to be found. When she finally came in, the majority of the surgery was finished. Plaintiff remarked, "It's about time," when Ms. Harrah finally arrived. Because she did not follow protocol when she arrived, she had contaminated the field. The rule is, if you witness someone contaminate the field, you must report it. When Plaintiff disclosed this to the nurse circulator, she became very upset. Several other people witnessed this and nothing was done. Plaintiff then walked out to start another surgery.

28. After the surgery, Ms. Roig approached Plaintiff. She told Plaintiff that three people said Plaintiff was acting in a "threatening manner." Plaintiff explained to Ms. Roig that was not true, and then explained that they did not follow contamination protocol, which ultimately can be detrimental to the patient. Ms. Roig would not hear it and fired Plaintiff on the spot and asked for Plaintiff's badge. Security was waiting to escort Plaintiff off the premises.

29. When Plaintiff was walking out, he asked Arnold (scheduler) why he did not "back me up." Mr. Smith remained quiet. The security officer who escorted Plaintiff out then revealed that word was going around that Plaintiff supposedly threatened Ms. Roig, which was completely untrue.

30.     Plaintiff learned when he arrived home (and the police were at his house) that he was being accused of slapping Dr. Reynolds. This, of course, was also untrue. Even Dr. Reynolds denied this. Oddly, the police never spoke to Dr. Reynolds himself. Plaintiff believes Ms. Harrah was again behind this false accusation. Plaintiff's girlfriend—who also works for Defendant—addressed the issue with Dr. Reynolds, who said the claim that Plaintiff slapped him was simply "ridiculous." Additionally, Plaintiff was criminally trespassed for one year from the hospital due to the false accusations of threatening Ms. Roig and slapping Dr. Reynolds.

## Administrative Prerequisites Exhausted

31.     On September 24, 2019, Plaintiff dual-filed a charge of disability discrimination and retaliation with the federal Equal Employment Opportunity Commission and the Texas Workforce Commission—Civil Rights Division. On September 11, 2020, the EEOC issued a right to sue letter, which was received by Plaintiff's counsel several days later. Plaintiff now files this lawsuit within 90 days of his receipt of the RTS letter and within two-years of the date he filed the underlying charge of discrimination.

## Disability Discrimination in Violation of the ADA
## (as amended by the ADA Amendments Act) and the TCHRA

32.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 31 supra. Defendant is an employer within the meaning of the ADA and the TCHRA in that in each year relevant to this lawsuit, it has employed more than 15 employees in 20 or more calendar weeks. Likewise, Plaintiff was an employee of Defendant within the meaning of the ADA and the TCHRA.

33.     At all times relevant to this lawsuit, Plaintiff suffered from Post-Traumatic Stress Disorder, which rendered him, and continues to render him, substantially limited in various major life activities. Despite these limitations, Plaintiff is a qualified individual and was fully capable

of performing her job with Defendant. While Plaintiff was employed by Defendant, Defendant, including the management employees involved in the decision to discharge Plaintiff, were aware that Plaintiff suffered from PTSD as a result of his experiences serving as a combat medic in combat operations overseas.

34. Plaintiff avers that Defendant's stated reason(s) for discharge were pretextual, that Plaintiff's discharge was orchestrated by individuals who harbored animus against Plaintiff due to his PTSD, and that in fact, Plaintiff was discharged because of his disability.

35. As a result of Defendant's illegal discrimination, Plaintiff has suffered, and will likely continue to suffer in the future, lost wages and benefits. Additionally, Defendant's illegal discrimination against Plaintiff has caused Plaintiff emotional distress, mental anguish, humiliation, embarrassment, damage to reputation, and loss of enjoyment of life. Plaintiff also sues to recover damages for these injuries.

36. Moreover, because Defendant acted with malice, or with reckless indifference towards Plaintiff's federal-protected rights, Plaintiff is entitled to an award of punitive damages. Moreover, because Plaintiff has had to retain legal counsel to vindicate his rights under the ADA and the TCHRA, Plaintiff is entitled to an award of attorney fees and costs of court.

## Jury Demand

37. Plaintiff demands a trial by jury.

## Conclusion and Prayer

38. Plaintiff prays that upon final judgment he be awarded the following:

a. Lost wages and benefits in the past and in the future;

b. Compensatory damages for emotional distress, mental anguish, humiliation, embarrassment, damage to reputation; and loss of enjoyment of life;

c. Exemplary/punitive damages;

d. Attorney fees;

e. Costs of court;

f. Pre- and post-judgment interest; and

g. All other relief to which Plaintiff is entitled.

Respectfully submitted,

*[signature]*

Michael V. Galo, Jr.
State Bar No. 00790734
Federal Bar No. 19048
GALO LAW FIRM, P.C.
4230 Gardendale, Bldg 401
San Antonio, Texas 78229
Telephone: 210.616.9800
Facsimile: 210.616.9898
Email: mgalo@galolaw.com
ATTORNEY FOR PLAINTIFF
SCOTT KILLINGSWORTH